No. 20,010.

THE UNITED STATES TIRE COMPANY OF NEW YORK, *Appellant,*
v. ALBERT E. KIRK and ELMER C. ASPEY, Copartners, etc.,
*Appellees.*

### SYLLABUS BY THE COURT.

1. GENERAL SALES AGENT—*Authority to Make Settlement by Accepting Return of Goods.* On the facts stated in the opinion it is held there was sufficient evidence from which the jury might infer that a general sales agent had authority to make an agreement to accept a return of the goods and merchandise sold to a creditor of the principal in payment of the purchase price.

2. SAME—*Settlement Made—Constructive Delivery of Goods.* The facts stated in the opinion are held sufficient to sustain a finding of a settlement between the plaintiff and the defendants, by the terms of which the plaintiff agreed to accept a return of the specific goods sold and give credit to the defendants' account for the amount thereof, and that the settlement was executed by the constructive delivery of the goods to the plaintiff's agent.

Appeal from Reno district court; FRANK F. PRIGG, judge. Opinion filed March 11, 1916. Affirmed.

*W. G. Fairchild,* and *H. S. Lewis,* both of Hutchinson, for the appellant.

*F. L. Martin,* and *Van M. Martin,* both of Hutchinson, for the appellees.

The opinion of the court was delivered by

PORTER, J.: The action in the district court was to recover the sum of $4490.58, the balance claimed on an account for goods and merchandise sold and delivered by the plaintiff to the defendants from August 2 to November 25, 1913. The defendants filed a voluminous answer, setting up several defenses, including misrepresentation as to the quality of the goods; fraud and deceit; damages to their business; and the further defense of a settlement. Some of the defenses were eliminated by the rulings of the court; others were submitted to the jury, but the only one which needs to be considered in this appeal is that involving the question of a settlement.

There is no controversy over the fact that the defendants

owed the plaintiff the amount sued for, as the balance due on the account, unless the indebtedness is discharged by the alleged settlement. The jury returned a general verdict in favor of the defendants and answered certain special questions, and found that the account had been settled as claimed by the defendants. A number of questions are raised by the plaintiff's appeal, but the only real question remaining for determination is whether the special finding that there was a settlement which bars the plaintiff's right to recover is contrary to the law and the evidence.

The plaintiff is engaged in the manufacture of automobile tires, casings and tubes. On the 15th of January, 1913, it entered into a written agreement with the defendants by which the latter were to purchase, sell and distribute goods manufactured by the plaintiff. The contract expired by its terms on August 1, 1913. The defendants handled the goods of the plaintiff for the territory surrounding Hutchinson, and did a jobbing and retail business. The contract provided that they were to settle on the 10th of each month for goods purchased and delivered during the month previous, and were to make all adjustments on tires and tubes that might become necessary under the guarantee of the tire company, in accord with instructions from the plaintiff from time to time; and credit was to be given the defendants for all proper replacements and adjustments made with customers according to the terms of the guarantee, which was on a mileage basis of 3500 miles. Prior to August 1, when the contract expired, the business transacted between the parties amounted to about $40,000. All goods purchased previous to that date had been settled for at the end of each month.

As early as July the defendants complained of the quality of the casings and tubes, and claimed they were obliged to make too many adjustments with customers. There was considerable correspondence between the parties from that time, involving complaints on the part of defendants in regard to the quality of the goods and complaints on the part of the plaintiff that the defendants were too liberal in their allowances to customers in adjustments. Notwithstanding these complaints, the defendants early in September applied for a renewal of the contract for the ensuing season, but two weeks

later, while their application was being considered by plaintiff, they entered into a contract for the coming year with another tire company. Meanwhile they continued to order goods from the plaintiff, and their aggregate purchases from August 2 to November 25 amounted to over $15,000. Cash payments were made by them during this time to the amount of $5000. The credits to which they were entitled for adjustments left the balance for which the plaintiff sued.

The settlement is pleaded in the answer substantially as follows: The defendants demanded of plaintiff that the latter accept a return of the goods on hand because of the inferior quality thereof, and give the defendants credit for the cost price; that—

"31. . . . thereupon the plaintiff, through its agent, L. A. Brown, informed the defendants that it would settle with them and accept the said tubes, tires and casings which were unsold and promised the defendants that it would send their representative to check over all of the said tires, casings and tubes on hand and give the defendants credit for the amount thereof and accept a return of the said goods and discontinue the business dealings provided for in the said contract with the defendants. That thereupon the defendants and the plaintiff, through the said agent, L. A. Brown, and other agents of the plaintiff, G. S. Shugart and Jno. J. Watts, did proceed to make a complete check and invoice of all the tires, casings and tubes on hand in the defendants' possession in accordance with the said agreement and contract and thereupon these defendants tendered to the said plaintiff all of said tubes, tires and casings unsold and of the aggregate invoice price of about $4800 to the plaintiff and thereupon the plaintiff's agent, G. S. Shugart, refused to carry out the contract made for a settlement of the matter between the plaintiff and defendants and refused to accept the said tires and casings.

"32. Defendants say that said adjustments and settlements were made in good faith by the defendants and that by reason thereof, the refendants are entitled to a credit upon the itemized account exhibited to the plaintiff's petition, for the full amount of all of said casings, tires and tubes."

L. A. Brown was the sales manager of the plaintiff at Kansas City and the business with the defendants was transacted through his office, except that all payments by defendants were made direct to the general office of the plaintiff at New York City. Albert E. Kirk, one of the defendants, transacted most of the business for the defendants, and his testimony with reference to the settlement is, that in September, while his application for a renewal of the contract was pending, he

had the first conversation concerning a settlement with Brown at Kansas City, in which he informed Brown that he was contemplating making a contract with another tire company for the coming season, and said:

" 'Brown, you have n't got anything for me only a lot of junk, I have got to get something else or lose my business,' and he said, 'I will take it up with the company.' He came to Hutchinson—in the meantime he had Mr. Watt come here and check up our tires to see if we had enough to check up our account. Mr. Brown says to me, he said 'Can I have these tires if I want them?' I said, 'Take them, they are yours.' He said, 'I will let you know in two or three days,' and he went back to Kansas City; in a short time after that he called up and said, 'On Tuesday Mr. Shugart and I will be down to check this stuff out; we will probably want to send it to Kansas City or Wichita.' "

Kirk further testified:

"Q. Did you go over all your accounts and check the whole thing over? A. Yes, sir.

"Q. According to this agreement? A. Yes, sir; and we checked up the tires and found that there was plenty to cover the account.

"Q. How many tires did you have on hand, in dollars, compared with the amount of the accounts? A. $6500 and their claimed account was about $4,490, I think, in that neighborhood.

"Q. Where were these tubes and casings at that time? A. All setting in the tire racks in our place of business.

"Q. You may state whether or not you were able to pay the freight on them to Wichita or Kansas City. A. Yes, sir.

"Q. And were you willing to do so. A. Yes, sir.

"Q. Did you inform them of that fact? A. Yes, sir. We paid plaintiff under this contract between $35,000 and $36,000 which does not include goods on hand at the time of this settlement."

Over plaintiff's objections the court admitted in evidence a letter written by the defendants to the plaintiff company dated October 31, 1913, which contained the following statements:

"On July 28th we wrote a letter to your Kansas City branch telling them that unless your tires of the G. & J. line was made to give better service, it would be necessary for us to change to another line.

"We have had a constant fight in regard to adjustments we have been making. Have been compelled to raise our percentage of adjustments or lose the privilege of adjusting tires. This was all previous to our signing for the new contract. We were then having considerable trouble, but in the last 40 days we have adjusted $3,000.00 worth of tires. These tires are coming in on us so fast that we notified your Mr. Brown at Kansas City that we would change to another line and that we could not continue to fight with you people in our efforts to

Tire Co. v. Kirk.

give our customers service, and it was injuring our prospects for tire business in this territory.

"We later arranged for the Fisk line of tires. Last week your Mr. Brown called the writer up and told him not to ship any of these tires back to the factory, that we had on hand which amounts to between $4,000.00 and $4,500.00 worth that had not been settled for, that he and Mr. Shugart would be here the following Tuesday and would probably want to ship them to Wichita or Kansas City, and that they would check them out, inasmuch as we were dissatisfied with them.

"Mr. Brown and Mr. Shugart came and we checked up tires unpaid for and found that we were entitled to check back about $4,400.00 worth of tires. However, this does not include Red tubes, or Wrapped tread casings with the G. & J. brand on them, as these tires and tubes have been giving us good service, and we have paid for these and expect to sell them.

"Mr. Shugart positively declined to take these tires over as per Mr. Brown's agreement over the phone while in Kansas City, and demanded his money and finally wound up by promising us that he would put this matter in the hands of a collector. . . . We would like to know just what disposition you mean to make of this matter, as these tires are here subject to your disposition. These tires were never checked over to the Hutchinson Motor Car Company after dissolution, and the new concern has nothing to do with them.

"The writer offered to box the tires in question up and deliver them to the depot, and in case the company wished it, ship them to either Wichita or Kansas City, freight prepaid. We give you timely notice in regard to this matter. . . . Trusting we will hear from you as to what disposition you are making of these tires, at an early date, we are."

The objection to the admission of the letter to support defendants' contention as to the settlement relied upon are, that it contains many self-serving declarations as to the facts, including statements of an alleged conversation with Brown in which he is said to have agreed to accept a return of the goods, and the letter appears by its date to have been written after the refusal to accept a return of the goods and when defendants knew that plaintiff was intending to hold them liable for their purchase price. If it was not competent evidence there is force in the claim that its admission was prejudicial error; inasmuch as it is largely made up of a statement by defendants of facts favorable to defendants' contention relating to the alleged settlement, and the burden of proving the settlement rested upon defendants. The majority of the court are of opinion that, since the writer of the letter appears to have testified substantially to the same facts, and the plaintiff had

an opportunity to answer the letter with a denial of the facts if it desired to do so, there was no prejudicial error in the admission of the letter in evidence.

Brown was a witness for the plaintiff, and denied that he had ever agreed to take back the goods and credit them on the account, and also denied that he had authority to enter into such an agreement. No testimony was offered to contradict his statement that his authority as agent of the plaintiff was limited to the usual duties of a sales agent and that he was not authorized to receive goods and credit them on a customer's account. The testimony of defendants is that all remittances for payment in cash were made direct to the company at its New York office. It appears, too, that while Brown made the preliminary arrangements for the contract covering the season of 1913, the contract itself was made with the New York office; that the defendants, when they applied to Brown for a renewal of the contract, knew that the application had to be approved by the company at headquarters. In the first conversation which Kirk testified he had with Brown when the question of the settlement was broached, Kirk said Brown had told him he would "take it up with the company." On these facts plaintiff insists that no authority to make the alleged settlement is shown, and that, on the contrary, it is self-evident that defendants were fully aware that Brown, as agent, lacked authority to make such an agreement, and decisions are cited to the effect that a sales agent has no implied authority to collect the purchase price of merchandise sold nor to agree to accept a return of the goods in lieu of payment.

The majority of the court are of the opinion that there was evidence for the jury to determine the question of the *implied,* which means the *actual,* authority of Brown. (See discussion of the law in reference to an agent's *implied* as distinguished from his *ostensible* authority in *Wilson v. Haun,* ante, p. 445.) From the evidence showing that after Brown agreed to "take it up with the company" he went to Hutchinson, checked up the stock on hand and made the statements testified to by Kirk, the jury might have believed he had obtained from his principal the necessary authority to make the arrangements for accepting the goods in lieu of the cash price. Brown's

testimony is that he went to Hutchinson and checked up the goods on hand and the account with the defendants at the request of the credit department of the plaintiff company, because there was some question respecting the financial responsibility of defendants. It appears that the defendants, who had conducted their business under the name of the Hutchinson Motor Car Company, dissolved their partnership—just when is not stated, but apparently the plaintiff had been informed of the fact before Brown and Shugart, the latter, plaintiff claims, representing the credit department, went to Hutchinson. The jury may have disbelieved Brown's statement of the purpose of his presence and conduct in checking over the accounts and stock.

The conclusion of the court is, that there was sufficient evidence from which the jury might infer that he had actual authority to make the settlement. The plaintiff, conceding, for the purposes of argument, that Brown possessed the necessary authority, strenuously urges that there was no agreement that the contract for the settlement should satisfy the debt, but only that the goods should be taken back and defendants' account credited with the cost price thereof; that as the agreement was not executed and the goods remained in the possession of the purchaser, there was and could be no payment of the debt by virtue of the agreement until it was fully executed by an acceptance of the goods. On this question the majority of the court holds there was evidence to sustain a finding (which must be regarded as included in the general verdict) to the effect that there was a constructive delivery. Kirk's testimony is that he said to Brown, "The goods are yours, take them"; also that he informed Brown that he was able, ready and willing to prepay the freight to the place where plaintiff desired them shipped.

For the reasons stated, the judgment will be affirmed.

PORTER, J. (dissenting) : I have grave doubts whether there was any evidence upon which the jury could infer authority on the part of the sales agent, Brown, to make an agreement to accept goods in payment of the price, but, aside from the question of his authority, I can not concede that either the agreement to take them back or what occurred at

the time the goods were checked over satisfied the debt the defendants owed for the purchase price.

The defendants' case must either stand or fall upon the fact that Brown agreed to accept a return of the goods to the amount of the debt, or upon what occurred at the time the goods were checked up. The agreement itself could not satisfy the debt in the absence of a contract to that effect. If the agreement had been that Brown was to accept defendants' note due in the future, and defendants had tendered their note, a refusal to accept it would not have discharged the debt. To have that effect the contract must have been that the execution and delivery of such a note was to constitute payment. After the goods had been checked up and it had been found that there were $6500 worth of them on hand, all of which Kirk says were sitting in the racks at defendants' place of business, this is what occurred: Brown said: "Can I have these tires if I want them?" Kirk said: "Take them, they are yours." Brown then said: "I will let you know in two or three days." In addition to this Kirk testified that he offered to prepay the freight on the goods to the place plaintiff might desire them shipped. Shugart notified the defendant very shortly afterward that the plaintiff would not accept the goods and that the claim would be placed in the hands of a collector. On cross-examination Kirk's testimony shows that after the refusal to accept the return of the goods defendants treated the goods as their own and continued to sell from the stock without discrimination. In fact, no discrimination was possible, because the particular goods to satisfy the debt had never been set aside from the rest of the tires purchased from the plaintiff, and there was no way to identify them. At the time of the trial Kirk said he had on hand only about $2700 worth of tires and tubes, but that he had on hand $900 from adjustments. Of course defendants' right to make adjustments at the expense of plaintiff terminated with the contract, and, moreover, the proceeds of the adjustments and the value of the goods remaining amounted to only $3600, while the debt was $4490. It is true that when the obligation is payable in specific goods, a tender of the specific articles need not be kept good, because the tender vests the title in the tenderee and discharges the obligation. (38 Cyc. 165.) The obligation of the defendants was to pay cash by the 10th of each month.

Tire Co. v. Kirk.

While the ordinary rule is that, unlike a tender of money, a tender of specific goods need not be kept good, it is otherwise when after the tender has been refused the tenderer treats the specific property as his own and sells it.   (38 Cyc. 166.)

"Where a creditor offers to receive payment of his debt in certain property at a certain price, and the debtor tenders the property accordingly, which is refused by the creditor, and the debtor retains the property and disposes of it as his own, it is not a satisfaction of the debt." (*Mayfield v. Cotton*, 21 Tex. 1, syl.)

An examination of the answer as set forth in the majority opinion shows that defendants claimed no more with respect to the settlement than an agreement with Brown to accept a return of enough goods to be checked up at cost price to pay the debt, the checking of the goods, a tender of the goods and a refusal to accept them. As a conclusion of law, the answer states that by reason of all this, and the fact that the settlement was made in good faith on their part, defendants are entitled to a credit for the cost price of the goods tendered. I think that so long as the goods remained mingled with the general stock of similar goods in the racks in defendants' warerooms, there was neither an actual tender nor constructive delivery, and that because the defendants after the refusal to accept the goods treated them as their own and sold them, the defense of a settlement fails.

In my opinion it was error to admit in evidence defendants' letter to the plaintiff written after the refusal to accept the return of the goods and containing defendants' version of the facts.